T.C. Memo. 1997-510


UNITED STATES TAX COURT


BERNHARD F. AND CYNTHIA G. MANKO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 26025-93.                    Filed November 12, 1997.


<u>Irwin S. Meyer</u> and <u>Herbert Stoller</u>, for petitioners.

<u>Lawrence L. Davidow</u>, <u>Roland Barral</u>, <u>Kevin M. Curran</u>, and
<u>Louis A. Ramunno</u>, for respondent.


MEMORANDUM OPINION

JACOBS, <u>Judge</u>:  This case is presently before this Court on
petitioners' motion for partial summary judgment.

This case involves deficiencies, additions to tax, and
additional interest with regard to petitioners' Federal income

taxes for 1979 through 1983. Respondent's principal basis for the deficiencies is the disallowance of claimed deductions for losses and interest expense on straddles and Government security repurchase agreements entered into by Bernhard F. Manko (petitioner) both directly and through Arbitrage Management Investment Co. (Arbitrage Management) and related entities.

I.  Background

In Manko v. Commissioner, T.C. Memo. 1995-10 (Manko I), we held that: (1) Respondent made a blanket settlement offer to all Arbitrage Management investors; (2) petitioners accepted the offer; and (3) respondent and petitioners reached a binding settlement agreement no later than January 21, 1988. In reaching this conclusion, we found that pursuant to this settlement agreement, the Internal Revenue Service (IRS) would: (1) Allow the deduction of 20 percent of the challenged losses (or, at the taxpayer's option, out-of-pocket cost plus 15 percent); (2) eliminate capital gains in an amount commensurate with the disallowed losses; and (3) forgo the assertion of penalties.  Manko I involved tax year 1978.

II.  The Parties' Pleadings

Petitioners filed the petition herein on December 10, 1993, and, except for further pleadings, the case was held in abeyance pending the Court's decision in Manko I.  On February 22, 1996, petitioners filed a motion for partial summary judgment requesting the Court to determine that there was a binding settlement

agreement between respondent and petitioners, and that the settlement terms (1) allowed them to deduct 20 percent of the Arbitrage Management losses and expenses and to exclude 80 percent of the Arbitrage Management gains they reported on their 1979-83 returns, and (2) precluded respondent from imposing any additions to tax (including fraud), other than additional interest.

On April 25, 1996, respondent filed a notice of objection contending that this Court's findings in Manko I related only to petitioners' 1978 tax year and not to the years involved herein, which were not docketed at the time of the settlement. Respondent also contended that Manko I did not affect the applicability of the fraud additions to tax herein because respondent had not determined fraud for 1978 (and the Court in Manko I could not have intended to eliminate the fraud additions for 1982 and 1983). On brief, respondent further argued that: (1) Respondent did not authorize his representatives to settle nondocketed years; and (2) petitioners are bound by the finding of the U.S. District Court for the Southern District of New York in a 1991 criminal case involving petitioner, which stated that there was no settlement between petitioners and respondent for petitioners' 1982 or 1983 tax years. On May 1, 1996, petitioners filed a reply to respondent's notice of objection.

The Court held a hearing on September 9 and 10, 1996, with regard to petitioners' motion for partial summary judgment.

## III. The Case Herein (Manko II)

Respondent determined deficiencies in petitioners' Federal income taxes, additions to tax, and additional interest as follows:

| | | Additions to Tax and Additional Interest | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 | Sec. 6621(c) |
| 1979 | $2,676,752 | $133,838 | --- | --- | --- | --- | --- | [2] |
| 1980 | 1,926,696 | 96,335 | --- | --- | --- | --- | --- | [2] |
| 1981 | 2,284,248 | --- | $114,212 | [1] | --- | --- | --- | [2] |
| 1982 | 1,794,143 | --- | 89,707 | [1] | $897,072 | [1] | $448,536 | [2] |
| 1983 | 1,649,568 | --- | 82,478 | [1] | 824,784 | [1] | 412,392 | [2] |

[1]   50 percent of the interest due on the deficiency.
[2]   120 percent of the interest due on the entire deficiency.  Pursuant to the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1), 100 Stat. 2744, former sec. 6621(d) was redesignated as sec. 6621(c).

For 1982 and 1983, the negligence additions to tax were imposed with respect to the liability of Cynthia G. Manko, and the fraud additions to tax were imposed with respect to the liability of petitioner.[1]

All section references are to the Internal Revenue Code in effect for the years under consideration, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.

The primary issue for decision is whether the settlement agreement applicable to petitioner's Arbitrage Management gains and losses in 1978 (Manko I) is likewise applicable to his Arbitrage Management gains and losses for the years in issue, 1979 through

---

[1]   The notice of deficiency also made adjustments for items unrelated to petitioner's interest in the partnerships, including an adjustment for unreported interest income for 1980. These unrelated issues have not been resolved.

1983. In other words, we must determine whether the blanket settlement offer that petitioners accepted was an offer to settle an <u>issue</u> (i.e., the deductibility of Arbitrage Management losses) or a specific taxable year.

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by this reference. We also incorporate herein the facts enumerated in Manko I. For a better understanding of this case, we repeat a portion of those facts.

Petitioners resided in Lighthouse Point, Florida, at the time they filed their petition. They timely filed joint Federal income tax returns for 1979 through 1983.

A. <u>Arbitrage Management</u>

Arbitrage Management began operations in the mid-to-late 1970's. From 1978 through 1981, Arbitrage Management dealt primarily in the acquisition of straddle positions in U.S. Treasury bill options. Beginning in 1982, Arbitrage Management dealt primarily in the acquisition of U.S. Government securities financed by repurchase agreements.

Petitioner served as a principal of Arbitrage Management and a general partner of limited partnerships that invested in Government securities acquired through Arbitrage Management (Arbitrage Management partnerships). On their 1978 through 1983 tax returns, petitioners deducted petitioner's distributive shares

of losses from Arbitrage Management partnerships. The deductions regarding 1978 through 1983 played a role in the settlement negotiations.

B. Arbitrage Management Negotiators

Theodore Kletnick, an attorney in respondent's North Atlantic Regional Counsel Office, served as respondent's lead counsel in Arbitrage Management settlement negotiations. Howard Berman, an attorney in respondent's New York City District Counsel Office, assisted Mr. Kletnick in Arbitrage Management settlement negotiations from 1987 through 1990.

On January 15, 1987, this Court held a pretrial conference with respect to Arbitrage Management cases. At that conference, the Court designated John S. Nolan, Barbara T. Kaplan, and Hugh Janow to serve as lead counsel for Arbitrage Management partners in subsequent Arbitrage Management settlement negotiations.

C. Arbitrage Management Negotiations

The Court assigned the negotiators the task of either negotiating a settlement for Arbitrage Management cases or selecting one or more Arbitrage Management test cases for litigation. Negotiations began in the spring of 1987.

D. Settlement Agreement

On January 6, 1988, the negotiators informed the Court that they had reached a "tentative settlement agreement". The negotiators advised the Court that a few of the individual partners

would litigate their cases. A letter from Mr. Kletnick to Mr. Nolan dated January 12, 1988, states:

> On December 22, 1987 we met and reached an agreement as to a method of resolving the cases involved in this project. This settlement methodology is operative so long as there is no material deviation from our understanding that we are splitting the tax stakes on an 80-20 basis (or cash plus 15 percent). Your letter dated December 29, 1987 accurately reflects the settlement methodology, except for the basis adjustment and limit.

Pursuant to this agreement, the IRS would: (1) Allow the deduction of 20 percent of the challenged losses (or, at the taxpayer's option, out-of-pocket cost plus 15 percent); (2) eliminate capital gains in an amount commensurate with the disallowed losses; and (3) forgo the assertion of penalties.

On January 15, 1988, Mr. Kaplan hand-delivered to Mr. Kletnick a letter that states:

> The following named Tax Court petitioners have agreed to accept the settlement offered by the Internal Revenue Service to partners in Arbitrage Management Project partnerships and as described in letters to you from John S. Nolan, Esq. of Miller & Chevalier, dated December 29, 1987 and January 7, 1988, respectively (copies attached).

The letter lists approximately 135 Arbitrage Management partners, including petitioner, by name and docket number. The docket number listed for petitioner covers tax year 1978 only. The letter further states: "we understand that a petitioner's acceptance of this settlement offer also constitutes an acceptance of the same

settlement terms for any Arbitrage Management partnership in which the petitioner invested for all partnership years." (Emphasis added.) The January 15, 1988, letter essentially covered taxpayers who had only docketed cases as well as taxpayers who had both docketed and nondocketed cases. Ms. Kaplan included with this letter a copy of a letter from Mr. Nolan to Mr. Kletnick, dated December 29, 1987, that describes the blanket settlement offer that the partners accepted.

On January 21, 1988, Mr. Kletnick sent the Court a letter that states: "Enclosed herewith are copies of listings of cases forwarded to this office reflecting acceptance of the Service's settlement offer." Petitioner's name and 1978 docket number are included on that list. The January 21, 1988, letter was signed by Mr. Kletnick on behalf of Agatha L. Vorsanger, Regional Counsel.

On February 25, 1988, Messrs. Kletnick and Nolan and Ms. Kaplan attended another pretrial conference before the Court. At that conference, Mr. Nolan stated that "we were able to reach a basis of settlement with Mr. Kletnick, and we have communicated that to all of the partners in the Arbitrage Management partnerships." The parties advised the Court that they had settled all or virtually all of the Arbitrage Management partnership cases, and that they believed it unlikely that they would require a trial. Messrs. Nolan and Janow and Ms. Kaplan understood that their jobs were done and asked to be relieved of their responsibilities as

lead counsel. The Court then discharged them from their responsibilities as lead counsel.

A letter from Mr. Berman to Ms. Kaplan dated April 21, 1988, states:

> Enclosed please find a copy of an Internal Revenue Service Memorandum, dated April 1, 1988, concerning the Arbitrage Management ("AMIC") settlement position. Mr. Kletnick has agreed that you or any taxpayer who invested through AMIC may use this memo when attempting to have an Arbitrage Management statutory notice rescinded.

The attached Internal Revenue Memorandum, dated April 1, 1988, sent to all IRS offices from Regional Counsel, North Atlantic Region (Ms. Vorsanger), states in pertinent part:

> We have received authorization to disseminate settlement guidelines with respect to Arbitrage Management Investment Company cases. The basic agreement is that the taxpayers are entitled to 20 percent of the tax stake, or cash + 15 percent if greater. The Service is entitled to 80 percent. A proper allocation by year is required. Within this basic agreement, we have devised the methodology, outlined below, which is different for individual investor and partnership case.
>
>     *    *    *    *    *    *    *
>
> Penalties described in I.R.C. Sections 6653, 6659 will not be imposed.

E. Implementation of the Settlements

Although the parties had settled the issue of the deductibility of the Arbitrage Management losses, the settlements still needed to be implemented. Under the settlements, most taxpayers had deficiencies in earlier years and overpayments in later years.

Arbitrage Management partners emphasized that they wanted respondent to establish a procedure whereby the IRS could process the deficiency and overpayment years at the same time, so that the taxpayers could pay a net amount.

After the February 25, 1988, pretrial conference, Mr. Kletnick sent the Court quarterly status reports of the Arbitrage Management cases. The reports described the progress of the IRS in developing settlement implementation procedures regarding all tax years individuals invested in Arbitrage Management. For instance, an October 24, 1988, status report sent to the Court states in pertinent part:

> The settlement <u>implementation</u> procedures, with respect to individuals who were partners in TEFRA partnerships, are currently being considered by the Office of Chief Counsel in Washington, D.C. As you well know, the parties <u>had agreed</u> to resolve <u>all of the years</u> which were in dispute as a result of an individuals [sic] "investment" in AMIC. In many cases this involves settling a taxpayer's 1978 through 1987 years. It has been estimated by the Examination Division of the Internal Revenue Service that this settlement will affect over 800 partnerships and 9,000 individual tax returns. [Emphasis added.]

Moreover, in a January 30, 1989, status report, the Court was notified that: "the settlement implementation procedures, with respect to individuals who were partners in TEFRA partnerships, have been approved and issued by the Office of Chief Counsel in Washington, D.C." The status reports did not suggest that the IRS

was continuing to contemplate the preliminary question of whether to permit deductions for Arbitrage Management losses.

Respondent's counsel and Arbitrage Management partners' counsel eventually agreed upon a form of closing agreement to settle the cases. A December 21, 1989, letter from Mr. Nolan to Mr. Kletnick states:

> I am writing to you on behalf of two groups of partners that retained Miller & Chevalier and Saltzman & Holloran to negotiate a settlement for their Tax Court cases. At long last, it is my pleasure to enclose with this letter a copy of the standard language for Form 906 closing agreements that we anticipate the Internal Revenue Service will offer to all of the partners in the following Arbitrage Management partnerships
>
>    *     *     *     *     *     *     *
>
> It is our understanding that the attached language will be used to resolve the Arbitrage Management <u>issues for all partners</u> (whether or not they belong to one of the two groups we represent) and for <u>all years</u> (<u>whether or not they are docketed in the Tax Court</u>).
>
>    *     *     *     *     *     *     *
>
> As you know, a Form 906 closing agreement is a final determination covering specific matters, and has no effect on matters that are not discussed in the language of the agreement. This is particularly important in this case because the settlement we reached for Arbitrage partners resolves the amount of taxable income, deductions, gains and losses from the Arbitrage partnerships for <u>all taxable years</u> (past, present and future). [Emphasis added.]

Attached to the December 21, 1989, letter is a Sample Language for Closing Agreement (Form 906) which states in relevant part:

> WHEREAS, the taxpayer(s) and the Commissioner wish to determine with finality all of the federal income tax consequences of the taxpayer's(s') interest in the partnership(s) for all taxable years;
>
> NOW IT IS HEREBY DETERMINED AND AGREED for Federal income tax purposes that:
>
> \*   \*   \*   \*   \*   \*   \*
>
> 10.   * * * no additions to the tax or penalties shall be imposed with respect to the taxpayers' interest in the partnership(s), including the additions and penalties described in I.R.C. sections 6653, 6659, and 6661.

A "netting" provision was also included in the sample closing agreement.

On December 22, 1989, Mr. Kletnick replied to Mr. Nolan's letter, stating: "With respect to your letter dated December 21, 1989, as we discussed, our office has forwarded the proposed revised closing agreement to the National Office and, subject to administrative approval, we expect its issuance in the next few days."

Respondent entered into closing agreements with many Arbitrage Management partners. Respondent, however, refused to enter into a closing agreement with petitioner with regard to any relevant year (i.e., 1978, 1979, 1980, 1981, 1982, or 1983).

F.  Petitioner's Criminal Proceedings

In 1986, approximately 2 years before Mr. Kletnick drafted the letter confirming the settlement, a criminal investigation into petitioner's Arbitrage Management activities was in progress.  Mr. Kletnick is unsure of when he learned of the criminal investigation, but believes it to be early 1987.  Petitioners' negotiators knew of the possibility of a criminal investigation as of December 1987. The criminal charges against petitioner related to the repurchase (repo) transactions entered into by certain Arbitrage Management partnerships during 1982 and 1983. The primary issue in the criminal trial was whether the repo transactions were fraudulent.

During the criminal trial in the U.S. District Court for the Southern District of New York, petitioner sought to introduce evidence that respondent had settled the civil tax claims against petitioner and that these claims were based on the same facts and theory as the criminal charges. Petitioner asserted that the settlement constituted an admission by the Government that petitioner was at least partially justified in deducting the losses that were claimed to be fraudulent in petitioner's criminal trial. The Government objected to the admission of evidence of the settlement on the grounds that: (1) Respondent had not in fact settled his civil tax claims against petitioner; and (2) even if respondent had entered into such a settlement, evidence of the

settlement was inadmissible under rule 408 of the Federal Rules of Evidence.

Following argument on the relevance and admissibility of evidence of the alleged settlement, the District Court, relying on Ecklund v. United States, 159 F.2d 81 (6th Cir. 1947), held that even if the evidence showed that the Government had settled its civil claims with petitioner, proof of the settlement was inadmissible under rule 408 of the Federal Rules of Evidence. Nevertheless, the District Court held a hearing on December 20, 1990, in the absence of the jury for the purpose of determining whether the civil tax case of petitioner had been settled with respondent. Mr. Nolan and Ms. Kaplan testified at the criminal hearing on behalf of petitioner, and Mr. Kletnick testified on behalf of the Government, offering contradicting testimony. The record in the criminal hearing included Mr. Nolan's letters of December 29, 1987, and January 7, 1988, Ms. Kaplan's letter of January 15, 1988, and a transcript of the Tax Court pretrial conference of February 25, 1988. At the conclusion of the hearing, the District Court, crediting Mr. Kletnick's testimony, found that no settlement had occurred between respondent and petitioner for 1982 or 1983. In sum, the District Court precluded petitioner from presenting to the jury evidence that respondent had agreed that petitioner could deduct 20 percent of his partnership losses both

as a matter of fact (the settlement did not exist) and as a matter of law (if it did, rule 408 barred its admission).

On February 4, 1991, petitioner was convicted on multiple counts of Federal income tax offenses for years 1982 and 1983 in violation of section 7206(1) and (2), and conspiracy to defraud the United States in violation of 18 U.S.C. section 371. Petitioner's conviction and sentence were affirmed by the U.S. Court of Appeals for the Second Circuit. United States v. Manko, 979 F.2d 900 (2d Cir. 1992). The Supreme Court denied certiorari. 509 U.S. 903 (1993).

In August 1995, petitioner filed a petition to the District Court to vacate his conviction, presenting newly discovered evidence of the settlement; namely, the January 21, 1988, letter. According to petitioner, this evidence was relevant to prove that the Government had allowed the deduction of a substantial portion of the losses that were the subject of the criminal proceeding.

The District Court denied petitioner's motion without a hearing and affirmed its earlier conclusion that any evidence of the purported civil settlements was inadmissible. Manko v. United States, 95 Civ. 1611 (S.D.N.Y., Aug. 18, 1995). Petitioner appealed the District Court's decision. The U.S. Court of Appeals for the Second Circuit vacated the District Court's denial of petitioner's motion, and stated:

In the present case, we conclude that the district court abused its discretion insofar as it based its decision to exclude the IRS settlement upon its conclusion that Rule 408 barred the evidence of the IRS settlement from Manko's criminal trial. Despite Manko's assertions to the contrary, however, we cannot conclusively determine on this record that a new trial is warranted. On remand, the district court must first determine whether, but for its misinterpretation of Rule 408, it would have admitted the relevant evidence of the settlement. In this regard, the district court should consider whether it would have admitted or excluded the evidence under Rule 403 of the Federal Rules of Evidence, taking into account any need by the government to explain how a settlement for less than the full amount of the claim might be consistent with its view that the defendant was criminally responsible for the amount of the fraud alleged in the criminal prosecution.

Thus, if the district court determines that the government knew, or should have known, of Kletnick's January 21, 1988 letter that indicated the falsity of his testimony, the suppression of the letter by the government was constitutional error if there is a "reasonable probability" that, had the letter been disclosed to the defense, the result of the proceedings would have been different. Kyles v. Whitley, ___ U.S. ___, ___, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); see Wallach, 935 F.2d at 456. To this end, the district court must ask whether "the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles, ___ U.S. at ___, 115 S.Ct. at 1566 (quoting United States v. Bagley, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985)). If, on the other hand, the district court concludes that the prosecution was unaware of the letter and its failure to disclose it was inadvertent, a new

> trial is required only if "'the court [is left] with a firm belief that but for [the erroneous exclusion], the defendant would most likely not have been convicted.'" Wallach, 935 F.2d at 456 (quoting Sanders v. Sullivan, 863 F.2d 218, 226 (2d Cir. 1988)). We leave this, and any other remaining issues as to the effect of nondisclosure, to the judgment of the district court.

Manko v. United States, 87 F.3d 50, 55 (2d Cir. 1996). As of the release date of the opinion in this case, the District Court has not rendered its decision.

G.  Respondent's Suspension Letter

On June 22, 1988, Mr. Kletnick sent petitioner a letter (suspension letter) stating that, at the request of the U.S. Attorney's Office, the IRS was "suspending consideration of the settlement" of petitioner's case until September 30, 1988. Petitioner's counsel understood this letter only to mean that the implementation of the settlement was deferred. Mr. Kletnick never received a response to the suspension letter.

Prior to the issuance of the suspension letter, the IRS had never treated the settlement of petitioner's case any differently than the settlement of cases of the other Arbitrage Management partners. Nor did the IRS ever advise petitioner that respondent would treat petitioner's distributive share of Arbitrage Management partnership losses as a nonpartnership item. At no time during the settlement negotiations that preceded Ms. Kaplan's January 15, 1988,

acceptance letter did any IRS representative inform Mr. Nolan, Mr. Janow, or Ms. Kaplan that respondent's settlement offer to the Arbitrage Management partners excluded petitioner.

## IV. Discussion

The main issue we must herein determine is whether the settlement terms were intended to apply to Arbitrage Management transactions for petitioners' 1979 through 1983 tax years.

Rule 121 provides for summary judgment on legal issues in controversies where there is no genuine issue of material fact. Commercial Union Ins. Co. v. McKinnon, 10 F.3d 1352, 1354 (8th Cir. 1993); Sundstrand Corp. & Consol. Subs. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994); Naftel v. Commissioner, 85 T.C. 527, 528-529 (1985); Jacklin v. Commissioner, 79 T.C. 340, 344 (1982). A fact is material if it "'tends to resolve any of the issues that have been properly raised by the parties.'" Boyd Gaming Corp. v. Commissioner, 106 T.C. 343, 347 (1996) (quoting 10A Wright et al., Federal Practice and Procedure: Civil, sec. 2725, at 93 (2d ed. 1983)). Partial summary judgment that does not dispose of all issues may be sought and granted. Elkins v. Commissioner, 81 T.C. 669, 674 (1983). The burden is on the moving party to show that it is entitled to summary judgment and that the matter may be decided on the basis of the evidence before this Court. Espinoza v. Commissioner, 78 T.C. 412, 416 (1982);

Gulfstream Land & Dev. Corp. & Subs. v. Commissioner, 71 T.C. 587, 596 (1979). Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. Florida Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988).

We discussed in Manko I the nature of, and requirements for, binding settlement agreements. Essentially, the compromise and settlement of tax cases is governed by general principles of contract law. Dorchester Indus., Inc. v. Commissioner, 108 T.C. 320, 330 (1997).

A. Scope of the Settlement Agreement

The evidence clearly establishes that there was one blanket settlement between respondent and petitioners (that respondent offered to all Arbitrage Management investors in December 1987) encompassing all years (both docketed and nondocketed) in which petitioners claimed Arbitrage Management partnership loss deductions. It was a package settlement. The settlement resolved an issue (i.e, the deductibility of Arbitrage Management losses) rather than a specific taxable year. Moreover, the offer was available to petitioners, who were members of a class to whom the offer was extended, on the same terms that were available to all other Arbitrage Management investors. Petitioners accepted the blanket settlement offer referred to in Ms. Kaplan's January 15, 1988, acceptance letter. That letter clearly stated that the

acceptances were based on the understanding that the settlement offer was applicable as a package to all years in which taxpayers had Arbitrage Management investments.  Settlement offers made and accepted by letters have been enforced as binding agreements.  See, e.g., Haiduk v. Commissioner, T.C. Memo. 1990-506.  Petitioners reached the settlement agreement, which we conclude under the circumstances of this case is a binding contract, no later than January 21, 1988.  See, e.g., Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436 (1969).

The joint status reports to the Court after the January 1988 settlement confirmed the parties' understanding that the settlement offer applied to both docketed and nondocketed years.  In addition to the documentary evidence, Mr. Nolan, Ms. Kaplan, and Mr. Janow also testified that the Arbitrage Management settlement was intended to apply to all years in which there were Arbitrage Management investments, both docketed and nondocketed. Messrs. Kletnick and Berman also testified to this effect ("we agreed to structure the settlement to encompass all years."  "The basis for settlement acceded to Mr. Nolan's request that it cover all years. * * * What the negotiators wanted was a general framework that encompassed all years and we agreed to that.").[2]  Assuming Mr.

_____

[2]     We note that even respondent's counsel conceded that
(continued...)

Kletnick did not believe that petitioners were covered under the settlement agreement for all years in which they claimed Arbitrage Management partnership loss deductions, this is nowhere reflected in the terms of the agreement.  In sum, the blanket settlement offer that petitioners accepted[3] was an offer to settle <u>all</u> years

---

[2](...continued)
the Arbitrage Management settlements were intended to apply to all years in which there were Arbitrage Management investments. William L. Blagg, one of respondent's counsel in <u>Manko v. Commissioner</u>, T.C. Memo. 1995-10, made the following comments during that trial:

> MR. BLAGG:  All that we wish to clarify is that the hearing only covered the years 1982 and 1983 and the letter that is -- the January 21st letter only deals with the docketed cases, which did not include the years 1982 and 1983.
>
> *     *     *     *     *     *     *
>
> THE COURT:  But the settlement, as I understand it, relates to all the years, docketed and nondocketed, for everybody else. Is that not correct?
>
> MR. BLAGG:  But the settlement is negotiated on -- the testimony has been that the settlement was negotiated on that basis; that's correct.
>
> THE COURT:  Right.  And you have reason to believe it wasn't?
>
> MR. BLAGG:  No, I do not.

[3]     Mr. Kletnick testified that he was unaware that the list enclosed with his Jan. 21, 1988, letter to the Court

(continued...)

in which petitioner had Arbitrage Management investments, whether or not those years were docketed. (We note that if the offer applied only to the docketed years, the parties could have simply filed a decision document. They did not do so.)

Moreover, all essential settlement terms were agreed upon no later than January 1988 (i.e., deduction of 20 percent of the challenged losses allowed; capital gains eliminated in amounts commensurate with disallowed losses; and no assertion of penalties). The concept of "netting" was also agreed to by the parties. Respondent, however, contends that the settlement negotiations vis-a-vis petitioners were suspended before agreement was reached on the netting issue, an essential term. Respondent argues that the suspension letter was sent to petitioners in June 1988 and final agreement on language of a netting provision to be included in a closing agreement was not reached until December 1989.

---

[3](...continued)
included all of the Arbitrage Management investors referred to in Ms. Kaplan's Jan. 15, 1988, acceptance letter. He testified that he mistakenly believed that the list included only Arbitrage Management investors who had accepted guideline settlement offers sent to them individually. We are not persuaded. There is no suggestion that Mr. Kletnick was misled in any way, and a unilateral error of counsel, in the absence of misrepresentation by the adverse party, is not a sufficient ground to vacate a settlement agreement. See Stamm Intl. Corp. v. Commissioner, 90 T.C. 315 (1988).

We disagree. The parties intended to and did in fact reach agreement on all essential terms for multiple years when petitioners accepted respondent's blanket settlement offer in January 1988. The settlement terms were clear. Cf. Nelson Bros., Inc. v. Commissioner, T.C. Memo. 1991-52. The offer included an understanding that netting would be allowed, whereby taxpayers who accepted the offer would be allowed to make one payment of the net amount owed instead of being required to pay earlier year deficiencies and wait for later year refunds. Although the manner in which the netting would be accomplished was not finally reduced to writing until December 1989 (as we held in Manko I), that was only a matter of implementing the settlement that had been reached when the blanket settlement offer was accepted in January 1988.[4]

In sum, we hold that all of the evidence before us indicates that: (1) The settlement covered all years in which petitioner had Arbitrage Management investments, docketed and nondocketed, including the years in issue; and (2) all essential settlement terms, including the agreement to apply overpayments against

---

[4] The reports Mr. Kletnick sent to the Court after the Feb. 25, 1988, pretrial conference confirmed his understanding that settlements had been reached. And Mr. Nolan's letters to Mr. Kletnick reflected the same understanding. For example, one letter stated: "Thank you for meeting with us yesterday to discuss the procedural difficulties that are delaying implementation of the settlement agreement that we reached in January and announced to Judge Jacobs in February."

deficiencies (netting), were agreed upon no later than January 1988. Accordingly, the parties are bound by the settlement agreement.

B.  Absence of Closing Agreement Inconsequential

Respondent contends that a closing agreement is necessary for settling nondocketed years. Accordingly, respondent continues, the absence of a properly executed closing agreement herein indicates that a settlement of petitioners' 1979-83 tax years (which were not docketed at the time the settlement was made) did not occur.

We disagree.  Sections 7121 and 7122 do not require a closing agreement form to settle a case pending before this Court.  See, e.g., Lamborn v. Commissioner, T.C. Memo. 1994-515; Haiduk v. Commissioner, T.C. Memo. 1990-506.  Petitioners' 1978 tax year was docketed at the time of settlement.  Although petitioners' 1979-83 tax years were not docketed at the time of settlement, the deficiencies for those years related to the same investment to which the deficiency for 1978 related.  Moreover, section 301.7121-1(d)(1), Proced. & Admin. Regs., provides that a request for a closing agreement may be made at any time "before a case with respect to the tax liability involved is docketed in the Tax Court of the United States."  However, a closing agreement is not a prerequisite for a valid settlement. Although we believe the settlement for the years involved in this case should have been

implemented by a closing agreement, respondent refused. Nevertheless, a binding settlement existed because the parties intended such an agreement.

C. Settlement Offer That Petitioners Accepted in January 1988 Was Properly Authorized

Respondent argues that the settlement with petitioners is not binding because Mr. Kletnick was not authorized to settle nondocketed years. Under section 7121 a taxpayer may enter into an agreement with the Secretary relating to the taxpayer's liability for any internal revenue tax for any period, and such a closing agreement will be final and conclusive in the absence of fraud, malfeasance, or misrepresentation of a material fact. The Secretary has delegated to the Commissioner the authority to enter into such closing agreements.[5] Paragraph 2 of Delegation Order No. 97 (Rev. 27), effective October 31, 1987, Handbook of Delegation Orders, Internal Revenue Manual, amended and supplemented by Delegation Order No. 225 (Rev. 1), 52 Fed. Reg. 13008 (Apr. 20, 1987), authorizes Associate Chief Counsels to enter into and approve agreements "with any person * * * for a taxable period or periods ended prior to the date of agreement". That authority is not limited to docketed years. Paragraph 4 of the Delegation Order

---

[5] Sec. 7851(b)(3); Treas. Dept. Order No. 150-32, 1953 CCH par. 3592, 1953 P-H par. 76,756; Treas. Dept. Order No. 150-36, 1954-2 C.B. 733.

authorizes Regional Counsels in nondocketed cases to enter into agreements with taxpayers. Paragraph 5 of the Delegation Order authorizes Regional Counsels in docketed cases under their jurisdiction "to enter into and approve written agreements with any person relating to the Internal Revenue tax liability of such person * * * in respect to related specific items affecting <u>other taxable periods</u>." (Emphasis added.)

It is clear from both the documentary evidence and the testimony of Messrs. Kletnick and Berman that the settlement agreement and terms thereof were authorized by respondent's National Office. The decision to make a blanket settlement offer was made by James J. Keightley, respondent's Associate Chief Counsel (Litigation), who instructed that it be made. His instruction was "flown through" Agatha Vorsanger, respondent's North Atlantic Regional Counsel, and Mr. Kletnick confirmed the settlement to this Court in the name and on behalf of Ms. Vorsanger.[6] Pursuant to Delegation Order No. 97, both Ms.

---

[6] The following colloquy took place between the Court and Mr. Berman during the trial of the case herein:

> THE COURT: And how did that breakthrough come about? Did the national office, specifically Mr. Keightley, in any way influence the breakthrough?
>
> THE WITNESS (Berman): My recollection, your
>
> (continued...)

Vorsanger and Mr. Keightley were authorized to settle with all Arbitrage Management investors, including petitioners.

Mr. Kletnick's role was to advise the Arbitrage Management taxpayers' lead counsel of the blanket settlement offer and its terms. Similarly, Mr. Kletnick's January 21, 1988, letter to this Court confirming acceptance of the blanket settlement offer did not purport to be on his own authority. The letter expressly stated that it was on authority of "Agatha L. Vorsanger, Regional Counsel".

The testimony before us supports our conclusion that the settlement offer was properly authorized. Mr. Kletnick testified

---

[6](...continued)
Honor, is that neither Mr. Kletnick nor I were particularly fond of settling the so-called repo years, but that the decision was made in Washington, I believe by Mr. Keightley, that it would be in the government's interest, for whatever reason, to enter into that settlement and we were -- would enter into a settlement with respect to those years, that we were instructed, accordingly, to do so.

THE COURT: And you were instructed by your supervisors?

THE WITNESS: We were instructed by the national office, again, I believe by Mr. Keightley, and that would have then flown through the regional office to Mr. Kletnick and then down to myself.

that "the basis for settlement was ultimately approved by the National Office", and Mr. Berman testified that "I believe authority was received [from the National Office] sometime in December of 1987." Mr. Kletnick also testified that he was instructed by Mr. Keightley to make the settlement offer.

In sum, the blanket settlement offer was properly authorized by officials of the IRS who we note also had authority to enter into closing agreements. It was made on instructions of Associate Chief Counsel Keightley. Petitioners' acceptance was confirmed to this Court by Regional Counsel Vorsanger.

### D. Settlement Agreement Terms Included Respondent's Agreement To Forgo Fraud Additions to Tax

Respondent argues that he may assert the fraud additions to tax against petitioner because the imposition of these additions is simply an "outgrowth" of petitioner's criminal conviction. We disagree. Respondent agreed as part of the settlement to forgo the assertion of penalties and additions to tax. The settlement terms clearly included an agreement that respondent would not assert additions to tax under "IRC section 6653"; that is the only section under which the fraud additions could be imposed for the years in issue. We give full effect to this specific settlement term.

We further believe that at the time of the settlement, respondent did not intend to treat petitioner's case differently

from the cases of other Arbitrage Management partners, and respondent did not impose fraud additions on the other Arbitrage Management partners. Moreover, Mr. Kletnick acknowledged that he was aware of the Arbitrage Management criminal investigation at the time of the settlement; nevertheless, respondent chose to settle with petitioners. As part of the settlement, respondent agreed to forgo the section 6653 additions to tax. This was a valid settlement, and once reached, cannot be repudiated by either party. See Stamm Intl. Corp. v. Commissioner, 90 T.C. 315 (1988). Thus, we hold that respondent may not assert the fraud additions against petitioner.

### E. District Court's Determination Irrelevant Herein

We reject respondent's contention that petitioners are bound by the District Court's finding that no settlement was entered into between respondent and petitioners for 1982 and 1983. The District Court's decision was superseded by the decision of the U.S. Court of Appeals for the Second Circuit in Manko v. United States, 87 F.3d 50 (1996), which remanded the case for the District Court to determine whether the exclusion of settlement evidence deprived petitioner of a fair trial. The District Court's finding as to the nonexistence of a settlement has no preclusive effect at this time.

Respondent contends that collateral estoppel applies. We disagree. Collateral estoppel precludes litigation by parties or

their privies, in a later suit on a different cause of action, of issues of fact and law actually litigated and necessarily decided by a court in reaching a prior judgment. United States v. Mendoza, 464 U.S. 154, 158 (1984). As we stated in Hudson v. Commissioner, 100 T.C. 590, 593-594 (1993):

> For obvious reasons, where a trial court's judgment is vacated, reversed, or set aside by an appellate court, collateral estoppel will not apply to the trial court's conclusions of law or findings of fact. * * *
>
> where a trial court's conclusions of law or its findings of fact are challenged on appeal and where the appellate court affirms the trial court's judgment on grounds different from those relied upon by the trial court and does not pass on the trial court's conclusions of law or findings of fact, collateral estoppel will not apply to the trial court's conclusions of law or findings of fact. * * *
>
> The underlying rationale for this limitation on collateral estoppel is that, where an appellate court does not pass on a trial court's conclusions of law or findings of fact with regard to a particular issue that is appealed, the party who lost before the trial court has not had a full and fair opportunity to litigate, at the appellate level, the trial court's conclusions of law or findings of fact. * * * Under this limitation, where a trial court's conclusions of law or findings of fact are not passed on by the appellate court, the trial court's conclusions of law or findings of fact are effectively set aside, and the trial court's conclusions of law or findings of fact cannot be used as the basis for collateral estoppel in a subsequent proceeding between the same parties. * * *

Here, the District Court's judgment was vacated. Accordingly, following Hudson v. Commissioner, supra at 593, collateral estoppel does not apply to the District Court's conclusions. Moreover, in vacating the District Court's judgment, the Court of Appeals cast doubt in particular on the finding that no settlement was reached. See Manko v. United States, 87 F.3d at 53.

The Court of Appeals concluded that rule 408 of the Federal Rules of Evidence does not require exclusion of evidence relating to a civil settlement in a criminal trial, and that the District Court abused its discretion in holding that evidence of the settlement was inadmissible as a matter of law. Id. at 55. The Court of Appeals did not rule on whether a settlement between petitioner and respondent existed. To a certain extent, the District Court's finding on this matter was insulated from review, owing to the court's reliance on rule 408 of the Federal Rules of Evidence and the fact that even if such a finding were erroneous, it might not entitle petitioner to a new trial in the criminal case. Thus, because the Court of Appeals did not rule on the District Court's finding that no settlement took place, that finding by the District Court cannot be used as the basis for collateral estoppel herein. See Hudson v. Commissioner, supra at 593-594. Consequently, for the aforementioned reasons, we reject respondent's collateral estoppel argument.

Accordingly, we shall grant petitioners' motion for partial summary judgment.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.